[Cite as *State v. Ellis*, 2025-Ohio-2978.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 31141 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| THOMAS LEE ELLIS, III | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2023-10-3315 |

DECISION AND JOURNAL ENTRY

Dated: August 20, 2015

HENSAL, Judge.

{¶1} Thomas Ellis appeals his convictions by the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Mr. Ellis shot D.G. four times at approximately 9:45 p.m. on September 8, 2023. One of the bullets entered D.G.'s lower abdomen, lacerated his right iliac artery and right iliac vein, then lodged in his lower spine. As a result of that injury, D.G. lost 1.5 liters of blood and subsequently died. He sustained three other injuries as the result of bullets that entered his lower body from the rear and traveled upward before exiting or becoming lodged in his body. There were no eyewitnesses to the shooting. Mr. Ellis initially denied his involvement and then maintained that he had given his gun to another man who was the shooter. Finally, Mr. Ellis said that he confronted D.G. about violence directed toward D.G.'s girlfriend, D.F., and that after this

confrontation, D.G. charged at him. According to Mr. Ellis, he shot D.G. because he feared for his life.

{¶3} Mr. Ellis was charged with murder, felony murder, and felonious assault. Each charge was accompanied by a firearm specification under Section 2941.145(A). He filed notice of his intention to introduce evidence related to self-defense under Criminal Rule 12.2, and the matter proceeded to trial. A jury found Mr. Ellis guilty of each charge, and the trial court merged the murder and felony murder counts for purposes of sentencing. The trial court concluded that the firearm specifications did not merge. The State elected for Mr. Ellis to be sentenced on the murder charge, and the trial court sentenced him to life in prison with parole eligibility after fifteen years. The trial court also sentenced Mr. Ellis to three years in prison for each firearm specification, to be served consecutively to each other but concurrent with his life sentence. Mr. Ellis appealed, assigning three errors for this Court's review.

II.

**ASSIGNMENT OF ERROR I**

[MR. ELLIS'S] CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE AS A MATTER OF LAW.

{¶4} Mr. Ellis's first assignment of error argues that his convictions are not supported by sufficient evidence because the State did not prove that he acted purposely or knowingly.

{¶5} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 2009-Ohio-6955, ¶ 18 (9th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). For purposes of a sufficiency analysis, this Court must view the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

We do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proved beyond a reasonable doubt. *Id.* A challenge to the sufficiency of the evidence tests the State's burden of production rather than its burden of persuasion. *State v. Ross*, 2023-Ohio-1185, ¶ 10 (9th Dist.). A sufficiency review and a manifest-weight review "are separate and legally distinct determinations." *State v. Walter*, 2022-Ohio-1982, ¶ 17 (9th Dist.), quoting *State v. Vicente-Colon*, 2010-Ohio-6242, ¶ 18 (9th Dist.). When this Court reviews the weight of the evidence, we must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986).

{¶6} Section 2903.02(A) prohibits any person from "purposely caus[ing] the death of another . . . ." Section 2903.11(A)(1), which prohibits felonious assault, prohibits any person from knowingly causing physical harm to another. Mr. Ellis maintains that the State did not demonstrate that he acted purposely under Section 2903.02(A) or knowingly under Section 2903.11(A)(1) because the evidence demonstrated that he was acting in either self-defense or the defense of another. In making this argument, Mr. Ellis directs our attention to his own testimony, arguing that because he testified that he acted in self-defense, the State did not produce sufficient evidence of his mental state. This argument is premised on the *weight* of the evidence rather than the legal sufficiency of the evidence that the State produced. Mr. Ellis has not developed an argument addressing the *sufficiency* of the evidence, and this Court will not construct that argument on his behalf. *See Ross* at ¶ 10. In addition, to the extent that Mr. Ellis's first assignment of error could be construed as an argument that the State failed to disprove that he acted in self-defense, the

Supreme Court of Ohio has held that the State's burden in a self-defense case cannot be challenged under a sufficiency analysis. *State v. Messenger*, 2022-Ohio-4562, ¶ 1. Mr. Ellis's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

[MR. ELLIS'S] CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶7}    In his second assignment of error, Mr. Ellis maintains that his convictions are against the manifest weight of the evidence because the State failed to disprove that he acted in self-defense. This Court does not agree.

{¶8}    A manifest weight challenge is the appropriate means of determining whether the State disproved that a defendant acted in self-defense under Section 2901.05(A). *Messenger* at ¶ 27. *See generally Thompkins*, 78 Ohio St.3d at 390 (Cook, J., concurring) ("[I]n deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion.").

{¶9}    Section 2901.05(B)(1) provides:

If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense . . . ."

The burden of persuasion to disprove a claim of self-defense is, therefore, on the State. *Messenger* at ¶ 26-27. This requirement "does not in itself cause the affirmative defense to become an element of the offense[ ]" and "[s]elf-defense remains an affirmative defense in Ohio[.]" *Id.* at ¶ 24. The elements of self-defense are:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape

from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

(Alteration in original.). *Id*. at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Because each element of self-defense must be present, "the state can defeat a self-defense claim by disproving any one of these elements beyond a reasonable doubt." *State v. Knuff*, 2024-Ohio-902, ¶ 191.

{¶10} Mr. Ellis does not dispute that he fired the shot that killed D.G. He maintains, as he did at trial, that he did so in self-defense. At trial, D.F. testified that she was D.G.'s girlfriend and that the two were living together at 866 Beardsley Street on the date of the shooting. D.F. recalled that four days before the shooting, she and D.G. had been drinking and had an argument. On that day, D.F. ran from their apartment in her underwear because she did not want to get into a fight with D.G. She testified that the police were called, but the couple had reconciled by the time they arrived. According to D.F., several neighbors were present during the incident, but they were not familiar to her. She testified that none of the neighbors she saw that day were present in the courtroom.

{¶11} D.F. testified that, on the day of the shooting, she returned home from a birthday party around 8:00 p.m. Because the couple did not have access to a shower in their basement apartment, D.G. wanted to shower at an acquaintance's house. D.F. testified that she disagreed, but she testified that she left the house with D.G. anyway. Their disagreement continued as they left the house, but D.F. testified that neither was upset: they did not have a physical altercation, and their voices were "[a] little loud, but not yelling." She testified that they had not used drugs that evening and that D.G. did not appear to be under the influence of drugs or alcohol. According to D.F., the couple parted ways, and she crossed the street with a female acquaintance. D.F. testified that she did not hear anything else before she heard multiple gunshots and D.G. calling

for her.  When asked if she recognized Mr. Ellis in the courtroom, D.F. testified that she did not remember seeing him before.  Specifically, she testified that she did not see him on the date of the shooting.

{¶12}  R.W. and S.C., who lived in the same neighborhood, testified about what they witnessed the night of the shooting.  R.W. was home alone with his children on that evening around 9:45 p.m. when he heard multiple gunshots.  He testified that he stepped onto the front porch and saw S.C. getting out of her car.  According to R.W., he then saw someone run past the house.  R.W. identified that person as Mr. Ellis, and he recalled that he asked, "Hey, brother, are you okay?"  R.W. testified that Mr. Ellis responded, "I capped that motherf****r.  I capped that motherf****r.  I got him."  R.W. also recalled that Mr. Ellis said, "He shouldn't be beating on f*****g women."  R.W. testified that he saw Mr. Ellis approximately two or three minutes after he heard the gunshots, and he testified that Mr. Ellis went to his house, which was three houses to the left of his own, after their conversation.  About five minutes later, however, Mr. Ellis returned wearing different clothes.  R.W. testified that Mr. Ellis said, "I'm sorry your wife and children had to see that."  R.W. recalled an incident on September 4th.  He testified that on that date, he heard screaming and saw a woman in her underwear and draped with a blanket running.  He did not know the woman, and he did not know if D.G. was involved in that incident.

{¶13}  S.C. testified that on the night of the shooting, she was sitting in her car in the driveway when she heard gunshots.  She recalled that she did not hear any screaming or fighting before the shots were fired.  S.C. testified that she joined her husband on the porch and saw Mr. Ellis walking down the road.  According to S.C., R.W. asked Mr. Ellis if he was okay. She testified that Mr. Ellis replied, "I got that motherf****r.  I capped him[,]" but she also acknowledged that she told a police officer that Mr. Ellis said, "Yeah, I got that motherf****r.  I'm done dealing with

his s***." S.C. testified that Mr. Ellis "seemed like he was walking faster than usual, had kind of an aggressive look on his face." S.C. also remembered the September 4th incident. She testified that on that date, she heard noise and stepped outside her house. Once outside, she saw a woman wearing underwear and wrapped in a blanket. The woman was screaming, "He's beating me. He's beating me. Help. Call the cops." S.C. saw Mr. Ellis nearby and noted that he "seemed like he was very angry[,]" but she testified that she did not know whether he interacted with the woman.

{¶14} Sergeant Greg Kianos identified the evidence found at the crime scene, which he photographed after the evidence was marked with placards. According to Sergeant Kianos, that evidence followed a path in front of the house located at 854 Beardsley, across a walkway, and to where D.G. was found. The first nine placards marked the location of three cartridge casings and various personal items: a hat, a bottle of brandy, a boot, and two bingo lottery tickets. Placard seven marked a drop of blood. Sergeant Kianos testified that beginning at placard nine, the officers located a trail of blood. He explained that unique placards are placed to indicate where significant amounts of blood, which he also described as "pooling," are located. Sergeant Kianos testified that the trail of blood led around the house to where D.G. was found. The remaining placards marked the location of a drug pipe, some aluminum foil, and a lighter.

{¶15} The police officer who arrived at the scene first testified that there was a crowd surrounding D.G., but he explained that he did not find anyone who had seen an interaction between D.G. and the shooter. Officer Aaron Williams testified that witnesses saw the shooter run into a house further up the street. He explained that while officers were knocking on the door of that house, a man wearing dark jeans and a white tank top approached him with questions. Officer Williams identified Mr. Ellis as that man. Officer Gregory Parker, who was also assisting at the scene, learned that a suspect named "Thomas" had been identified. Officer Parker testified that he

heard a woman shout that name to a man across the street who was wearing a white tank top. When Officer Parker detained that individual, Mr. Ellis, he found a gun that was missing seven rounds from its magazine.

{¶16} Detective Thomas Aber canvassed the neighborhood after the shooting. He testified that although people on the street heard gunshots, no one mentioned seeing an interaction between Mr. Ellis and D.G. or hearing an argument before the shots were fired. Detective Aber also interviewed Mr. Ellis after he was arrested. He testified that Mr. Ellis provided three versions of his involvement in the shooting: he denied that he was involved at all, but he later maintained that he had given his gun to someone else who then shot D.F. Finally, according to Detective Aber, Mr. Ellis said that he confronted D.G. about violence directed toward D.G.'s girlfriend, D.F. and that after this confrontation, D.G. charged at him.

{¶17} Dr. Robert Shott performed an autopsy of D.G. He testified that D.G. suffered four gunshot wounds. According to Dr. Shott, the most significant wound resulted from a bullet that entered D.G.'s lower abdomen, lacerated his right iliac artery and iliac vein, and lodged in his lower spine. That gunshot wound resulted in one and one-half liters of blood loss, and Dr. Shott identified it as the fatal injury. Dr. Shott testified that D.G. would have lost consciousness within seconds or minutes of the gunshot wound to the abdomen but would have been alert until he lost consciousness. Dr. Shott explained that the bullet that inflicted the fatal injury approached "at a downward angle . . . heading front to back, downward into the pelvis naturally, and coming right to left toward the midline where it stops . . . ." Although Dr. Shott could not identify D.G.'s position when he received the fatal injury, he testified that it was possible that D.G. was lying down.

{¶18} Dr. Shott testified that the second, third, and fourth gunshot wounds were not as serious. The second wound that he described entered the outside of D.G.'s right calf, traveled upward, and lodged in the knee. Dr. Shott noted that the path of that bullet was "steeply upward" from D.G.'s calf toward his knee. He opined that it was "highly unlikely" that D.G. was standing upright when that shot struck him. According to Dr. Shott, the third and fourth traveled through the soft tissue of D.G.'s upper left and right legs. Each of those bullets also travelled upward through the leg before exiting D.G.'s body.

{¶19} Mr. Ellis's self-defense argument is grounded in his own testimony. According to his testimony, the September 4th incident provided the context for the shooting. Mr. Ellis testified that on that date, he saw a woman in the street who was screaming that she had been assaulted. Mr. Ellis testified that he spoke to the woman. He also testified that D.G., whom he had never seen before, approached the woman "[i]n an aggressive manner, like he had previously been drinking." Mr. Ellis had a gun tucked into his waistband. Although he testified that he did not brandish the gun, he recalled that "[a]t the time [D.G.] was making aggressive gestures, I let him know I had a firearm and not to approach."

{¶20} Mr. Ellis testified that on the evening of the shooting, he walked to a store to buy some snacks and cigars. After he returned to his house, he sat on the porch while smoking. Mr. Ellis testified that he heard "shouting" during an argument and believed that it was D.F. According to his testimony, Mr. Ellis then saw D.F. on the external second-floor stairs of her house, and the argument intensified. He testified that he "went down there to assist" because he knew "how it feels to be assaulted and having somebody not step up." Mr. Ellis testified that he yelled at D.G., who in turn yelled that he should mind his own business. According to Mr. Ellis, D.G. "came

down the steps yelling, shouting, cussing at me, threatening me." He expressed surprise that no one – including D.F. – mentioned that they heard yelling before the shooting.

{¶21} Mr. Ellis stated that D.G. reached into his pocket then "charged at me saying he was going to kill me." According to Mr. Ellis, D.G. was five to seven feet away and charged at him "kind of in a full speed." Mr. Ellis testified that he did not want to shoot D.G. and that the first shot fired accidentally. He stated that when D.G. continued to charge toward him, he continued to fire. Mr. Ellis's testimony about how the shooting progressed from the location where he confronted D.G. to the location where the physical evidence was located was unclear. He denied that he pursued D.G., but he also testified that he was "moving a lot" and did not know how much ground he covered while he was firing. Mr. Ellis could not explain the gunshot wounds that D.G. received. He testified that he consistently fired downward, but three of the four bullets that entered D.G.'s body travelled upward from their point of entry. Similarly, Mr. Ellis testified that D.G. was not running away from him, but the same three bullets entered D.G.'s body from behind.

{¶22} Mr. Ellis testified that when D.G. dropped to the ground, he panicked; not knowing what to do, he fled the scene. Mr. Ellis acknowledged that he encountered S.C. and R.W. but claimed that he told them, "I shot him. He's still breathing. What do I do next?" He did not remember making the statement that each of them recalled, but he acknowledged that he expressed anger at D.G. for violence toward women. Although he could see the first responders rendering aid to D.G., Mr. Ellis testified that he did not approach because he was afraid. Mr. Ellis admitted that he lied to the police about his involvement and the amount of ammunition in his gun. He also acknowledged that he gave three different accounts of his involvement during his interview with Detective Aber, and he testified that he told Detective Aber he would respond with violence if he found out someone had assaulted his own girlfriend.

{¶23}  The jury, therefore, heard testimony from Mr. Ellis that he confronted D.G. during a loud argument that D.G. was having with D.F., that D.G. yelled and approached him aggressively, and that he fired his gun when he feared that his life was in danger.  The jury also heard testimony, however, that contradicted Mr. Ellis's assertions.  Apart from his own testimony, there is no evidence that a loud argument occurred between D.G. and D.F. before the shooting or between D.G. and Mr. Ellis.  D.F. testified that although their voices may have been "a little loud," she and D.G. were not yelling.  She testified that she did not hear anything before the gunshots after she and D.G. parted ways.  Police officers testified that they were unable to find anyone else who heard an argument before the shooting.  S.C., who was sitting in her car before the shots were fired, testified that she did not hear any screaming or fighting.  Likewise, R.W. did not hear anything before the shots were fired.  Both S.C. and R.W. testified that Mr. Ellis exclaimed, "I capped that motherf****r.  I capped that motherf****r.  I got him."  R.W. also recalled that Mr. Ellis said, "He shouldn't be beating on f*****g women."

{¶24}  Mr. Ellis also testified that he shot D.G. as he approached at a run at close range, and according to his testimony he stepped forward and backward, but did not pursue D.G. from the area where the confrontation occurred.  The jury also heard testimony, however, that three of the four bullets that struck D.G. entered from behind him and traveled upward.  According to Dr. Shott, the bullet that caused the fatal injury could have been fired while D.G. was lying on the ground.  With respect to the location of the shooting, Sergeant Kianos explained that the physical evidence followed a path through the yard in front of the house located at a neighboring property.  The evidence there formed a path of spent cartridges and personal items that ended in a significant trail of blood leading to D.G.'s body.

{¶25}  This Court must "consider[] the credibility of witnesses" as part of our manifest weight review. *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172,175 (1st Dist. 1983). Nonetheless, this Court is mindful of the well-established principle that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Given the evidence in this case, this Court cannot conclude that this is the exceptional case in which the evidence weighs heavily against the conclusion that the State disproved that Mr. Ellis was not at fault in creating the situation that gave rise to the incident. *See State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. Mr. Ellis's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

[MR. THOMAS] RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶26}  Mr. Thomas's third assignment of error argues that he received ineffective assistance of counsel because his attorney did not ask the trial court to instruct the jury on voluntary manslaughter.

{¶27}  In order to demonstrate ineffective assistance of counsel, a defendant most show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. *Id*. at 694. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

{¶28} Mr. Ellis asserts that "based on [his] history and [D.G.'s] conduct, the outcome would have been different." He has not, however, developed any argument explaining why a voluntary-manslaughter instruction would have resulted in a different outcome in this case. This Court declines to construct such an argument on his behalf. *See State v. Smith*, 2017-Ohio-8680, ¶ 15 (9th Dist.), citing *Cardone v. Cardone*, 1998 WL 224934, *8-9 (9th Dist. May 6, 1998). Mr. Ellis's third assignment of error is, therefore, overruled.

## III.

{¶29} Mr. Ellis's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

JENNIFER HENSAL
FOR THE COURT

FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

WESLEY C. BUCHANAN, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.